## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**U.S. EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION,**                          *

    **Plaintiff,**                                    *

    **v.**                                           *          **CIVIL NO. JKB-19-2693**

**CACI SECURED TRANSFORMATIONS,**                   *
**LLC,** *et al.,*

    **Defendants.**                                  *

    *     *     *     *     *     *     *     *     *     *     *     *

## MEMORANDUM

This case arises from Mary Dyer's employment on and discharge from the Middleware III ("MWIII") NSA contract, which the U.S. Equal Employment Opportunity Commission ("EEOC") claims violated the Americans with Disabilities Act ("ADA"). In this case, the EEOC, on behalf of Dyer, brings claims against associated corporate entities (collectively, "Defendants") that were the prime contractors on the MWIII contract and that, for nearly all purposes, can be aggregated under the banner of CACI. (*See* Mot. Summ. J. Mem. Supp. at 4, ECF No. 75-1; Cross-Mot. Partial Summ. J. Mem. Supp. at 21–22, ECF No. 78-1.) Defendants did not formally employ Dyer, who was, on paper, an employee of third-party Defendant Que Technology Group ("Que").

Now pending before the Court are Defendants' Motion for Summary Judgment (ECF No. 75), and Plaintiff's Cross-Motion for Partial Summary Judgment (ECF No. 78). The parties' summary judgment motions are fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, the Court will deny Defendants' Motion for Summary Judgment (ECF No. 75) and grant Plaintiff's Cross-Motion for Partial Summary Judgment (ECF No. 78).

1

## I.    *Background*[1]

MWIII was a contract between Defendants and the NSA pursuant to which Defendants provided various engineering support services to the NSA. (*See* Cross-Mot. Partial Summ. J. Ex. 21, ECF No. 78-23.)   Among these services was the staffing of Multifactor Authentication ("MFA") help desks in various NSA offices. (Cross-Mot. Partial Summ. J. Ex. 22, ECF No. 78-24.) Relevant to this lawsuit are the help desks located at the National Business Park ("NBP") and NSA Headquarters ("OPS2A") locations.     These helps desks were staffed by Systems Administrators ("SAs") directly employed by Defendants as well as SAs sourced through subcontractors, including Que. (Weaver Dep. at 32:1–6, Mot. Summ. J. Ex. 2, ECF No. 75-5.)

In early 2018, a Que recruiter reached out to Dyer regarding a position as an SA on the MWIII contract. (Dyer Dep. Vol. II at 32:11–35:9, Mot. Summ. J. Ex. 7, ECF No. 75-10.) After Dyer indicated her interest in the position, Que submitted her resume to Defendants. (Cross-Mot. Partial Summ. J. Ex. 24 at 6, ECF No. 78-26.) On January 26, 2018, Dyer had a positive interview with Jody Barber, Defendants' help desk tech lead, and Defendants indicated to Que that they would be interested in hiring Dyer onto the MWIII project. (*Id.*) On February 6, Dyer signed a

---

[1] Defendants contend that in resolving these motions, the Court should decline to consider the Declaration of Mary Dyer that was submitted with Plaintiff's motion because it is a "sham." (Defs. Reply at 15–16, ECF No. 82.) While Defendants are correct that "an affidavit that contradicts deposition testimony cannot be used as a basis for denying summary judgment" (*id.* at 15), that rule requires an affidavit to "flatly contradict[] that party's earlier sworn deposition." *E.E.O.C. v. Ecology Servs., Inc.*, 447 F. Supp. 3d 420, 441 (D. Md. 2020) (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)). That is, the "inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Ecology Servs.*, 447 F. Supp. 3d at 441.

Although Defendants purport to identify several contradictions between Dyer's testimony and her affidavit, none of them are clear and unambiguous. For instance, they argue that Dyer's declaration that "Barber was my day-to-day supervisor on MWIII" contradicts her deposition testimony that "Barber was not standing 'by my side' telling her how to perform [SA] tasks." (Defs. Reply at 21.)   While these two statements are certainly related, any inconsistency between them is not clear and unambiguous. The same holds true with respect to the other contradictions Defendants point out.

"Contingent Employee Agreement" with Que that was conditioned on Dyer's selection "as a System Administrator for the TBD Que Technology Group program." (Cross-Mot. Partial Summ. J. Ex. 5 at 2, ECF No. 78-7.)  Dyer began her employment as an SA on the MWIII project shortly thereafter.

An SA's primary responsibility was to assist NSA personnel with MFA issues through either an electronic ticket system or on a walk-in basis. (*See* Barber Dep. at 21:16–19, 78:9–13, Mot. Summ. J. Ex. 3, ECF No. 75-6.)  These responsibilities were performed from help desk kiosks, under the supervision of Jody Barber.  (*Id.* at 34:20–36:19.)  Help desks were open from 6:00 a.m. to 4:00 p.m., which required SAs to work either early or late shifts, with some flexibility to adjust their schedules to accommodate personal appointments and other matters.  (*Id.* at 63:2–22.)  These schedules were approved by Defendants (*id.* at 36:15–19), and SAs were also required to record their time in Defendants' database. (Jennifer Johnson Dep. at 36:18–37:14, Cross-Mot. Partial Summ. J. Ex. 12, ECF No. 78-14.)

In addition to generally working a consistent shift, SAs were assigned a "home site" by Defendants.  (Barber Dep. at 256:13–257:3.)  As with selecting shifts, this "home site" served as a default work location, but SAs could be moved to other sites by Defendants as necessary to ensure help desk coverage. (*Id.* at 91:13–92:9.)  When she joined the MWIII project, Dyer's home site was NBP (*Id.* at 256:20–22), and she typically worked from 9:00 a.m. to 5:00 p.m.  (Mot. Summ. J. Ex. 16, ECF No. 75-19.)

About two months after being hired onto the MWIII contract, Dyer was involved in a car accident (Dyer Decl. ¶ 24, Cross-Mot. Partial Summ. J. Ex. 1, ECF No. 78-3), in which she suffered a concussion. (Cross-Mot. Partial Summ. J. Ex. 25.)  Due to her injuries from the accident, Dyer took medical leave from May 9 to August 12, 2018 while she received treatment for "chronic post-

traumatic headaches"[2] and related symptoms, including "difficulty with concentration, photophobia (light sensitivity), phonophobia (sound sensitivity), nausea, and dizziness." (Bollineni Decl. ¶¶ 3–4, Cross-Mot. Partial Summ. J. Ex. 2, ECF No. 78-4.) During this time, she regularly provided updates about her condition to both her Que manager (Yolanda Fogg) and her CACI manager (Barber). (*See* Mot. Summ. J. Ex. 10, ECF No. 75-13; Barber Dep. at 108:9– 109:6.)

On August 1, Dyer informed Defendants and Que that she had been referred to the National Rehabilitation Hospital for further treatment. (Cross-Mot. Partial Summ. J. Ex. 33, ECF No. 78-35.) That same day, Richard Weaver, CACI's MWIII Program Manager, emailed Quartus Johnson, Que's President, explaining that "[Dyer] has been out a very long time and we have held on as long as we can. I need to backfill this position and if and when Mary is released to work again we will try to place as best we can at that time." (Cross-Mot. Partial Summ. J. Ex. 34, ECF No. 78-36.) Johnson confirmed that Que understood Defendants had to "move forward with backfilling [Dyer's] position" and noted that Que was also "actively sourcing to find a backfill." (*Id.*) Fogg informed Dyer that her position might be backfilled if she was unable to return to work. (Bramwell Dep. at 63:4–18, Cross-Mot. Partial Summ. J. Ex. 10, ECF No. 78-12.)

On August 13, Dyer received a doctor's note clearing her to return to work. (Cross-Mot. Partial Summ. J. Ex. 36, ECF No. 78-38.) She returned to NBP, where she managed her ongoing symptoms by eliminating headache "triggers," such as stress, noise, and bright light. (Dyer Decl. ¶¶ 30, 36.) She also aimed to alleviate her symptoms through workplace interventions, such as medication, tinted prescription glasses, and an ergonomic chair provided by Que. (*Id.*) Outside of the office, her strategies included "physical therapy, acupuncture, chiropractic manipulation,"

---

[2] Prior to the car accident, Dyer had "reported having some headaches and sensitivity to bright lights" (Bollineni Decl. ¶ 6), but the accident resulted in a "substantial increase in headache frequency and severity." (*Id.*)

and mitigating the stress of her one-hour-and-twenty-minute-long commute to work by arranging to carpool with a colleague two-to-three times per week. (*Id.*) These strategies were sufficient to allow Dyer to effectively perform her work as an SA, and she received several positive customer reviews after returning from medical leave. (*See* Barber Dep. 124:2–10; *see also* Cross-Mot. Partial Summ. J. Ex. 3, ECF No. 78-5.)

On September 17, Jennifer Johnson—Barber's colleague at CACI—reached out to Dyer via Skype chat, explaining that "[w]e have a need for support at the OPS office. It may be temporary, it may not, we aren't sure yet. . . . What would your thoughts be on sitting at OPS?" (Cross-Mot. Partial Summ. J. Ex. 38 at 2, ECF No. 78-40.) Dyer responded that she felt that OPS2A would pose a "longer and bit more difficult commute" and raised concerns about the "commute/needs for my son, getting home at a certain time, & the post-concussion headaches i get from the commute already."[3] (*Id.* at 3.) Johnson insisted that the commute to OPS2A and the hours Dyer would be expected to work would remain largely the same. (*Id.*) She also forwarded the conversation to Barber twice, including the comments, "now what..." and, "all yours..." (*Id.* at 2; Cross-Mot. Partial Summ. J. Ex. 40.)

The following day, Dyer followed up by email with both Johnson and Barber, asking to shift her work schedule up one hour, and that she be permitted to leave the OPS2A office by 3:30 p.m. because "[t]he shuttle departure time from OPS 2A is 345 for me to make it back to NPB by 4, [to] catch my ride home, or get to my car."[4] (Cross-Mot. Partial Summ. J. Ex. 41 at 3, ECF No.

---

[3] Due to the informal nature of the Skype communications, the Court will reproduce them as written, but will make no efforts to correct errors appearing in the original conversations.

[4] Dyer's email refers to a shuttle that runs every fifteen minutes between OPS2A and NBP. (Dyer Dep. Vol. II at 125:18–21, Mot. Summ. J. Ex. 12, ECF No. 75-15.) There is also parking directly at OPS2A. (*Id.* at 151:7–17.) Dyer did not park directly at OPS2A during the time she worked there, and the parties dispute whether using the shuttle was the best logistical solution. (*Compare* Cross-Mot. Partial Summ. J. Mem. Supp. at 5 n.9 *with* Mot. Summ. J. Mem. Supp. at 8 n.3.)

78-43.) She also explained that the modified schedule "allows [her] to get to [chiropractic] appts, as well as acupuncture which help with the headaches that continue after the accident." (*Id.*)

In response, Barber reproached Dyer for what she saw as an attempt to unilaterally change her work hours, but nonetheless largely agreed to the proposed schedule—provided that Dyer stayed at OPS2A until 3:40 p.m. (*Id.*) Fogg responded to Barber's email to express that "[Dyer] is willing to help out the team to the best of her ability while juggling her personal responsibilities," and also to confirm that "the issue is resolved and the customer's needs are met in a timely and professional manner." (*Id.* at 2.)

On September 20, Dyer did a "dry run" of her new 8:00 a.m. to 3:40 p.m. schedule at OPS2A. (Cross-Mot. Partial Summ. J. Ex. 42, ECF No. 78-44.) That same day, Barber forwarded the September 18 email chain to Weaver and wrote, "bottom line, I think [Dyer] is unwilling to make the change to OPS2A for a short duration." (Cross-Mot. Partial Summ. J. Ex. 41 at 2.) She also alluded to a "discussion with Jen and I yesterday which involved full-fledged tears and how [Dyer] has trouble scheduling all the activities she must address as a single mother." (*Id.*) While Barber "completely under[stood]" these challenges, she felt there was "no way I can accommodate the needs of all individuals and ensure the kiosks have coverage." (*Id.*) On September 21, Dyer reported that the "dry run went fine," despite hitting "alot of traffic coming in," which caused her to "miss[] the initial shuttle [and] grab[] the next." (Cross-Mot. Partial Summ. J. Ex. 43, ECF No. 78-45.)

Early the following week, Dyer saw her physician and received a note that identified "triggers for her headaches" that "need[ed] to be restricted"—namely, "change in work environment, increased commute time, and increased noise levels." (Cross-Mot. Partial Summ. J. Ex. 44, ECF No. 78-46.) On September 25, Dyer followed up on her previous emails with Barber

6

explaining that, "[s]ince working at OPS, I've been experiencing issues with significant increases in headaches and pain," and indicating these issues were connected to the environment at—and commute to—OPS2A. (Cross-Mot. Partial Summ. J. Ex. 45 at 2, ECF No. 78-47.) She also mentioned that she had her "scheduled neurologist appt yesterday [and] received a note indicating some accommodations/restrictions, to include: using an ergonomic chair with head/neck support, restricting increased noise levels, increased commute time, and change in work environment." (*Id.* at 2–3.) Barber forwarded this email to Weaver, who opined that "[i]t sounds like [Dyer] needs to find a job that better fits her needs as we do as well," to which Barber responded, "LOL – don't disagree." (Cross-Mot. Partial Summ. J. Ex. 47 at 2–3, ECF No. 78-49.)

That same day, Fogg emailed Weaver about Dyer's disability, citing "documentation from [Dyer's] doctor summarizing accommodations/restrictions for her work environment, which [are] not available at the Ops 2A office," but noting that "[Dyer] is still willing to support the customer at Ops but can only do so on a temporary basis." (Cross-Mot. Partial Summ. J. Ex. 46 at 2, ECF No. 78-48.) Closing the loop, Weaver forwarded Fogg's email to Barber, explaining that he "will call [Fogg] and explain if [Dyer] cannot do the job then we need to replace her." (Cross-Mot. Partial Summ. J. Ex. 48, ECF No. 78-50.) Dyer continued to work at OPS2A following these email exchanges, despite the challenges posed by her schedule and her headaches. (*See* Dyer Decl. ¶¶ 44–46.)

On October 3, Dyer's neurologist followed up with her regarding the results of a Magnetic Resonance Angiogram that Dyer had undergone on October 1. (Bollineni Decl. ¶¶ 10, 12.) That test had identified a "5mm intracranial cerebral aneurysm of the right periopthalmic artery." (*Id.* ¶ 11.) Dyer, distraught, informed Fogg of her diagnosis, and then stepped away from her desk. (Bramwell Dep. at 113:2–21.) Another SA, Kenneth Brown, spoke with Barber by phone and

email to inform her that Dyer was upset and had stepped away, but that "she did not want you ladies to know before letting her supervisor know.  I assume she meant at her company." (Cross-Mot. Partial Summ. J. Ex. 51, ECF No. 78-53; Barber Dep. 173:18–174:22.)

Also on October 3, Barber met with Weaver and Quartus Johnson regarding the challenges with Dyer's transition from NBP to OPS2A.  That meeting resulted in Dyer's removal from the MWIII contract, though the participants disagree as to who made the decision to remove her. (*Compare* Quartus Johnson Dep. 40:13–45:8 (stating that Defendants removed Dyer from the contract), *with* Weaver Dep. 165:9–17 (stating that Quartus Johnson made the decision to remove Dyer over Defendants' protest).)  Fogg later informed Dyer that "CACI wanted her removed from the contract because she did not meet the performance requirements." (Bramwell Dep. 122:2–17.)

Following Dyer's removal from the MWIII contract, Que offered her work on two other Que contracts. (Mot. Summ. J. Ex. 24, ECF No. 75-27.)  However, both positions were outside of Dyer's experience range, and one also required "24x7 support which [she] wouldn't be able to provide in [her] current family situation." (*Id.* at 2.)

On September 13, 2019, the EEOC filed this lawsuit, naming Dyer as the "Charging Party." (Compl. at 1, ECF No. 1.)  They asserted that Defendants violated the ADA in three ways: (1) Defendants failed to accommodate Dyer in violation of Section 102 of the ADA; (2) Defendants discharged Dyer due to her disability in violation of Section 102 of the ADA; and (3) Defendants' contractual arrangement with Que violated Section 102 of the ADA by requiring Que, "pursuant to [Defendants'] demand, to terminate Dyer's employment based on her disability." (Am. Compl. ¶¶ 33–37, ECF No. 43.)

Following discovery, Defendants moved for summary judgment on all three Counts. Plaintiff cross-moved for summary judgment on the question of whether Defendants were Dyer's

employer within the meaning of the ADA, and otherwise opposed Defendants' motion. (*See* ECF No. 78.) Plaintiff has also moved for summary judgment to establish that, as a matter of law, (1) Dyer was a qualified individual with a disability within the meaning of the ADA, and (2) Defendants are an integrated enterprise. (*Id.*)

## II.    *Legal Standard*

Federal Rule of Civil Procedure 56 provides that a party can move for summary judgment on a "claim or defense—or the part of [any] claim or defense," provided it shows "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the Court will award summary judgment, unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). If sufficient evidence exists for a reasonable factfinder to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment will be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. When both parties file motions for summary judgment, the Court evaluates "each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 729 (D. Md. 1996) (citations omitted).

### III.   Analysis

The pending motions raise various cross-cutting questions of law, and the relevance of many of these questions is contingent on the Court's resolution of other pending issues. In resolving these questions, the Court proceeds in three parts. The Court's analysis begins with the threshold question of whether Defendants can be considered Dyer's joint employer for purposes of the ADA. This issue determines whether the parties' more specific arguments regarding the claims are relevant, or whether Plaintiff's claims collectively fail at this first hurdle.

Finding that Defendants are Dyer's employer for purposes of the ADA, the Court turns to Defendants' arguments as to why the undisputed facts nonetheless entitle them to summary judgment as to each individual claim. Plaintiff's claims survive both sets of arguments. As such the Court concludes by analyzing the non-dispositive issues raised by Plaintiff's cross-motion.

### A. Dyer's Employment Status

The Court begins with the parties' cross-motions on whether Defendants can be considered Dyer's employer for purposes of the ADA. On paper, Defendants do not employ Dyer. However, Plaintiff argues that Defendants have discriminated against Dyer "in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Reconciling this facial contradiction is a threshold issue in this case, and one on which the parties' views are diametrically opposed. Defendants believe the undisputed facts establish they did not employ Dyer, and Plaintiff contends the facts support the opposite conclusion.

This dispute brings to the fore "the reality of changes in modern employment, in which increasing number of workers are employed by temporary staffing companies." *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 410 (4th Cir. 2015). The ADA acknowledges these changes through the "joint employer doctrine," which "prevents those who effectively employ a

10

worker from evading liability by hiding behind another entity, such as a staffing agency." *Id.* An

entity that is not a plaintiff's formal employer may be "an 'employer' under the joint employment

doctrine" if "it exercised sufficient control of the terms and conditions of plaintiff's employment."

*Evans v. Md. State Highway Admin.*, Civ. No. JKB-18-0935, 2018 WL 4733159, at *5 (D. Md.

Oct. 2, 2018). The parties agree that this analysis is controlled by the nine-factor "hybrid" test

articulated in *Butler*, which requires a court to look at the following factors with respect to a

putative joint employer:

> (1) authority to hire and fire the individual;
> (2) day-to-day supervision of the individual, including employee discipline;
> (3) whether the putative employer furnishes the equipment used and the place of work;
> (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
> (5) the length of time during which the individual has worked for the putative employer;
> (6) whether the putative employer provides the individual with formal or informal training;
> (7) whether the individual's duties are akin to regular employee's duties;
> (8) whether the individual is assigned solely to the putative employer; and
> (9) whether the individual and putative employer intended to enter into an employment relationship.

*Butler*, 793 F.3d at 414. While "none of these factors is dispositive," the first "[t]hree factors are

the most important," and the "common law element of control remains the principal guidepost in

the analysis." *Id.* (internal quotation marks omitted). These factors must also be applied with a

view towards the purpose of the hybrid test, which "specifically aims to pierce the legal formalities

of an employment relationship to determine the loci of effective control over an employee, while

not discounting those formalities entirely." *Id.* at 415. Applying the factors with this goal in mind,

the Court concludes that Defendants and Que jointly employed Dyer as a matter of law.

### 1. Authority to Hire and Fire

The undisputed facts establish that Defendants had significant control over Dyer's hiring.

In contrast, their control over Dyer's firing is more indeterminate as Dyer ostensibly had the

11

opportunity to transition to a different Que project after removal from the MWIII contract. To avoid blending these distinct considerations, the Court divides its more detailed analysis of this first factor into two parts.

### a. *Authority to Hire*

Defendants' authority with respect to Dyer's hiring cuts in favor of a finding of joint employment. Although Que formally hired Dyer, they did so pursuant to a "Contingent Employment Agreement," which required Dyer to be "selected as a System Administrator for the TBD Que Technology Group program." (Cross-Mot. Partial Summ. J. Ex. 5 at 2.) Dyer and Que entered into this agreement only after Que had submitted Dyer's resume to Defendants and Dyer had successfully interviewed with Barber, Defendants' employee. *See Crump v. TCoombs & Assocs., LLC*, Civ No. MSD-13-0707, 2015 WL 5601885, at *19 (E.D. Va. Sept. 22, 2015) (finding that first factor cut in favor of joint employment where putative joint employer "reviewed Plaintiff's technical package, and as part of such review . . . conducted a phone interview with Plaintiff").

Despite their involvement in the interview process, Defendants point to two factors that they believe establish their lack of authority to hire Dyer: (1) a Que recruiter made initial contact with Dyer regarding her hire; and (2) Defendants could not have hired Dyer but for Que employing her. (Defs. Reply at 20–21.) The record makes clear, however, that all of Que's decisions around hiring Dyer were driven by Defendants' interest in placing her on the MWIII contract. As Defendants point out, "[a] Que Technology recruiter initially approached Dyer *about possible placement on MWIII*." (*Id.* at 20 (emphasis added).) Similarly, her being hired by Que was contingent on her placement on the MWIII contract. (*See* Quartus Johnson Dep. at 100:17–22 (testifying that Dyer would not have been hired by Que if she had not been placed on the MWIII

12

contract).) To the extent that Que had control over Dyer's recruitment and hiring, that control was exercised solely based on Defendants' interest in retaining her on the MWIII project. Thus, the "loc[us] of *effective* control" over hiring lay with Defendants. *Butler*, 793 F.3d at 414 (emphasis added).

### b. *Authority to Fire*

Who had effective authority to fire Dyer is a closer call. This factual dispute is also implicated by Plaintiff's third claim, where it argues that Defendants' removal of Dyer from the MWIII project caused her to be fired by Que. However, because Defendants believe Dyer's removal from the MWIII project did not contractually *require* her to be fired by Que, they analogize this case to *McAdory v. VAIL Technologies*, Civ. No. LMB-16-886, 2017 WL 1822276 (E.D. Va. May 4, 2017). In *McAdory*, the court concluded that defendant lacked the authority to fire plaintiff because it was "undisputed that VAIL lacked the power to fire McAdory from ALM group [her formal employer]; all it could do was terminate its relationship with ALM group." *Id.* at *5. Stark differences between the plaintiff in *McAdory* and Dyer render this analogy inapt.

Most notably, in *McAdory*, the plaintiff was not just an employee, but rather the founder, "President, Chief Executive Officer, and sole employee" of her formal employer. *Id.* at *1. Given this, it seems implausible that VAIL's decision to fire plaintiff had any effect on her continued good standing at her company. *Id.* In contrast, Dyer's employment at Que was far more, if not entirely, contingent on her continued work on the MWIII contract. This is because Que's policy was to not "hold people on overhead . . . if [they are] not on a billable contract," *i.e.*, Que did not retain employees who were not placed on a Que contract. (Quartus Johnson Dep. at 58:6–9.)

Further, Que's president testified that, formally, Dyer's employment at Que came to an end on October 3, 2018—the day of her removal from the MWIII project. (*Id.* at 58:2–4.) While

13

Defendants argue that Dyer's employment with Que did not end until after she was both removed from the MWIII project and not placed on another Que project, Que did not offer any alternative project opportunities to Dyer until October 5, two days after she had been formally fired by Que. (Mot. Summ. J. Ex. 24 at 2.) Thus, as a formal matter, Dyer was fired from Que immediately upon her removal from the MWIII project, with the possibility that she would be rehired if she was later placed on a different contract. While this certainly is not dispositive, the Court's analysis cannot "discount[] those formalities entirely." *See Butler*, 793 F.3d at 415.

In sum, Defendants' effective ability to end Dyer's employment with Que is not clearly established from the current factual record. For purposes of the joint employment test, however, this does not present a *material* factual dispute that precludes summary judgment, because the Court's overall analysis of the *Butler* factors would not change even if Defendants had some, but not total, control over Dyer's termination. *See Haze v. Harrison*, 961 F.3d 654, 658 (4th Cir. 2020) (internal quotation marks and citations omitted) ("[A] fact is material [only] if it might affect the outcome of the suit under governing law."). Even if Defendants could not fire Dyer from her role at Que, the remaining *Butler* factors, identified by the Fourth Circuit as the "most important," point towards a finding of joint employment. *See Butler*, 793 F.3d at 415 (finding joint employment where, "[a]lthough ResourceMFG was the entity that formally fired Butler, Drive had effective control over Butler's employment").

### 2. *Day-to-day Supervision*

Barber's day-to-day supervision of the MFA help desk means that this factor squarely favors Plaintiff. Barber exercised this supervisory capacity in a number of ways, including by controlling SAs' schedules, issuing weekly emails with assignments for SAs, and providing Standard Operating Procedures ("SOPs") for how SAs were to execute those assignments. (Pl.

Reply at 8, ECF No. 84.) Eliding these various supervisory functions, Defendants focus on the fact that Barber did not micromanage her SAs by "standing by [their] side telling [them] how to perform System Administrator tasks." (Mot. Summ. J. Mem. Supp. at 19.) This point is not compelling, however, because Defendants do not argue that anybody else was performing this oversight function. *See McAdory*, 2017 WL 1822276, at \*5 (emphasis added) (finding that putative joint employer did not provide day-to-day supervision where plaintiff "received her assignments, work hours, and duty station *from the Army OBT*, not from [defendant's] personnel"). The mere fact that Defendants did not exercise their supervisory authority in a particular way does not attenuate the amount of control they had over Dyer's day-to-day work.

This conclusion is confirmed by the sparse evidence of day-to-day oversight exercised by the NSA and Que. While Dyer testified that an NSA employee at times supervised her work at NBP, his role was limited to making sure the SAs at NBP "were there working," and his primary job was as "a supervisor [] or team lead for the actual government—government people." (Dyer Dep. Vol. I at 134:18–135:3, Mot. Summ. J. Ex. 25, ECF No. 75-28.)

Que's role was similarly hands-off with respect to Dyer's substantive day-to-day responsibilities. Although Fogg was involved with the issues that arose regarding Dyer's move to OPS2A, it does not appear that she had any substantive role with respect to Dyer's work as an SA. Que's intervention due to the extraordinary circumstances surrounding Dyer's medical leave and conflicts with her supervisors is not probative of Que's role in more conventional day-to-day supervision of Dyer. Que's involvement seems more analogous to escalation of certain personnel issues to a human resources department, rather than substantive supervision of Dyer's quotidian job functions. Confirming Que's role did not encompass Dyer's SA work, Barber supervised other SAs—who were employed directly by Defendants—in the same manner as Dyer. (Barber Dep.

15

24:6–22); *see also Butler*, 793 F.3d at 415 (finding that the second factor favored joint employment where "[defendant's] employees supervised both" workers employed by the plaintiff and other sets of workers"). Defendants' failure to offer any evidence that another entity had meaningful supervisory authority over Dyer confirms that this factor favors joint employment.

### 3. *Location and Nature of Work*

The third of the three key factors also cuts in favor of finding that Defendants employed Dyer. In *Butler*, the Fourth Circuit articulated this factor as "whether the putative employer furnishes the equipment used and the place of work." 793 F.3d at 414. Defendants read this directive literally and point out that the NSA provided both of these things. (Mot. Summ. J. Mem. Supp. at 20.) However, *Butler* goes on to explain that this third factor really looks to "where and how the work takes place, [and] is valuable for determining how similar the work functions are compared to those of an ordinary employee."[5] *Butler*, 793 F.3d at 414–15. The application of this factor in *Butler* confirms the latter reading—the Fourth Circuit found this factor favored joint employment where "Drive and ResourceMFG employees worked 'side by side,' performed the same tasks, and used the same equipment." *Id.* at 415 (citation omitted). Applied here, it is undisputed that Dyer worked "side by side" with and performed the same tasks as SAs directly employed by Defendants. (Barber Dep. 24:6–22.) These tasks were also performed in the same manner, following SOPs promulgated by Barber. (Defs. Reply at 21 (stating that Barber "promulgated SOPs for all System Administrators assigned to MWIII").) Although the SAs were formally employed by a variety of companies, they were identical with respect to their work at the MFA desks; the third factor favors a finding of joint employment.

---

[5] Applying this factor as Defendants do seems particularly inappropriate in this case, where Defendants do not even furnish the equipment used and place of work for the SAs that they directly employ on the MWIII project. *See Butler*, 793 F.3d at 414 (citing *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 261 (4th Cir. 1997)) ("[C]onsistent with our opinion in *Cilecek*, courts can modify the factors to the specific industry context.").

### 4. Remaining Factors

Of the three most important factors for determining whether a joint employment relationship exists, at least two-and-a-half cut in favor of such a finding. The six remaining factors are largely in equipoise, with three (four, five, and nine[6]) cutting against joint employment and three (five through seven[7]) cutting in favor of such a finding. The Court sees no reason to deviate from the direction predominantly indicated by the three core factors. *See Crump*, 2015 WL 5601885, at \*24 (finding no triable issue of fact where "[t]wo of the three most important factors . . . weigh in favor of a finding that the [defendant] employed Plaintiff," even though three other factors "militate[d] against employer status"); *see also Dreher v. Maryland*, Civ. No. GLR-17-3832, 2019 WL 528192, at \*4 (D. Md. Feb. 11, 2019) ("The first factor—authority to hire and fire—weighs in the other direction, but not so much as to outweigh the other principal factors.").

Further, the *Butler* factors "are not intended for mechanical application, but instead provide a framework to elicit the true nature of a putative employment relationship." *Greene v. Harris Corp.*, 653 F. App'x 160, 164 (4th Cir. 2016). The "true nature" of such a relationship remains tethered to the "common-law elements of control." *Butler*, 793 F.3d at 414. Looking at which—and not just how many—factors favor a finding of joint employment convinces the Court that Defendants, "while contracting in good faith with an otherwise independent company, ha[ve]

---

[6] "[T]he ninth factor regarding the subjective intent of the parties 'ordinarily will be of minimal consequence.'" *Akwei v. Burwell*, Civ. No. DKC-15-1095, 2016 WL 3440125, at \*5 (D. Md. June 23, 2016) (quoting *Butler*, 793 F.3d at 414 n.12).

[7] Notably, factor seven is "whether the individual's duties are akin to regular employee's duties." *Butler*, 793 F.3d at 414. Given the Fourth Circuit's articulation of factor three as a proxy for comparing the putative employee with a formal employee, this facet of the relationship appears to be double-counted in the *Butler* analysis. *Id.*; *see also Akwei*, 2016 WL 3440125, at \*6 (finding that the third factor cut in favor of an employment relationship where there was "little or no effective difference between the work performed by Plaintiff and [Defendant's] employees"). However, a nuanced discussion of the interrelation of these factors is unnecessary because, as discussed below, they are not a dispositive math problem, but merely useful tools for "elicit[ing] the true nature of a putative employment relationship." *Greene v. Harris Corp.*, 653 F. App'x 160, 164 (4th Cir. 2016).

retained for [themselves] sufficient control of the terms and conditions of employment" to be considered Dyer's joint employer. *Id.* at 408.

The only substantive functions that Que performed with respect to Dyer's employment on the MWIII project related to administrative matters, such as paying her, retaining her records, and tracking her medical leave. While all of these are undoubtedly critical to the functioning of a large enterprise, none are related to day-to-day control of an employee. Simply put, employees do not think their boss sits in human resources.

Under *Butler*, this sort of administrative outsourcing does not, standing alone, vitiate the joint employer relationship as a matter of law. *See Butler*, 793 F.3d at 415 ("[A]lthough ResourceMFG disbursed Butler's paychecks, officially terminated her, and handled employee discipline, it did not prevent Drive from having a substantial degree of control over the circumstances of Butler's employment. Accordingly, we . . . hold, as a matter of law, that Drive and ResourceMFG are Butler's joint employers."). Here, Defendants do not offer sufficient additional facts regarding Que's control over the circumstances of Dyer's employment to distinguish this case from *Butler*. Accordingly, the Court concludes that Defendants were Dyer's joint employer.

**B. Defendants' Motion**

Having decided this threshold issue in favor of Plaintiff, the Court turns to Defendants' additional reasons why Dyer's ADA claims should still fail at summary judgment. Plaintiff argues that material disputes of fact render judgment on these claims premature. Viewing the facts in the light most favorable to the nonmovant, the Court agrees there are material disputes of fact that prevent this Court from entering summary judgment. *See Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019).

### 1. *Failure to Accommodate*

Count one of the Amended Complaint alleges that Defendants failed to provide Dyer with reasonable accommodations for her disability in violation of 42 U.S.C. § 12112(b)(5)(A). To substantiate a failure to accommodate claim, a plaintiff must establish four things: "(1) that [s]he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [s]he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (cleaned up).

"Implicit in the fourth element is the ADA requirement that the employer and the employee engage in an interactive process to identify a reasonable accommodation." *Haneke v. Mid-Atl. Cap. Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005). Defendants' motion for summary judgment turns on this fourth element. Where failure-to-accommodate claims raise questions about the parties' engagement in the interactive process, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. . . . In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Crabill v. Charlotte Mecklenberg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135–36 (7th Cir. 1996)).

Defendants argue that the process broke down before it even got started, because at no point did Dyer "request [moving back to NBP] or any other accommodation from CACI." (Mot. Summ. J. Mem. Supp. at 32.) Plaintiff rejoins by identifying three such requests: Dyer's Skype chat with Jennifer Johnson; Dyer's September 18 email proposing a schedule that would allow her to work at OPS2A; and Dyer's September 25 email regarding her consultation with her neurologist.

19

(Cross-Mot. Partial Summ. J. Mem. Supp. at 32–33.) Defendants' briefing also identifies a fourth potential candidate, Fogg's September 25 email. (Mot. Summ. J. Mem. Supp. at 32); *see also Parkinson v. Anne Arundel Med. Ctr.*, 79 F. App'x 602, 604 (4th Cir. 2003) ("[A] request for accommodation need not, in all cases . . . be made by the employee."). Defendants contend that none of these communications constituted "a clear request for an accommodation." *Huppenbauer v. May Dep't Stores Co.*, 99 F.3d 1130 (4th Cir. 1996). However, from the relevant correspondence, a reasonable factfinder could conclude Dyer cleared the low bar for communicating the need for an accommodation of her disability. *See Rock v. McHugh*, 819 F. Supp. 2d 456, 473 (D. Md. 2011) (cleaned up) ("The burden to provide notice of a disability is not a great one[;] adequate notice simply informs the employer of both the disability and the employee's need for the accommodations for that disability.").

At a minimum, the two emails from September 25 could be construed by a reasonable factfinder to have been a request for accommodation. In Dyer's email, she states, "[s]ince working at OPS, I've been experiencing issues with significant increases in headaches and pain severity." (Cross-Mot. Partial Summ. J. Ex. 45 at 2.) She also identifies "some accommodations/restrictions" recommended by her neurologist, and offers to provide documentation of the same. (*Id.*) Fogg's email is even more explicit, stating that "Mary [ ] has documentation from her doctor summarizing accommodations/restrictions for her work environment, which is [sic] not available at the OPS 2A office." (Cross-Mot. Partial Summ. J. Ex. 46 at 2.) Even if prior correspondence was inadequate, these emails "inform[ed Defendants] of both [Dyer's] disability and [her] need for accommodation for that disability." *Rock*, 819 F. Supp. 2d at 473.

Defendants make much of the fact that these communications deny the need for the particular accommodation the EEOC now argues would have been reasonable—namely, returning

Dyer to NBP. (*See* Mot. Summ. J. Mem. Supp. at 35 ("Dyer admitted in her deposition testimony that 'the letters NBP' never appears in her email or Dr. Bollineni's letter").) However, the Fourth Circuit has made clear that an employer's responsibility to engage in the interactive process to identify a reasonable accommodation is triggered "even if the employee fails to identify a specific, reasonable accommodation." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 581 (4th Cir. 2015) (citation omitted). Thus, Dyer's failure to specify an accommodation is of no moment at this juncture. Her request makes clear that although she was willing to continue working at OPS2A, she required accommodation to do so. Plaintiff has provided evidence from which a factfinder could conclude that Dyer triggered the interactive process to identify what exactly that accommodation needed to be. Accordingly, Defendants' motion for summary judgment on Plaintiff's failure to accommodate claim must be denied.

### 2. *Discriminatory Discharge*

Defendants also argue that they are entitled to summary judgment on Dyer's discriminatory discharge claim because Dyer cannot prove her discharge was motivated by discriminatory animus. (Mot. Summ. J. Mem. Supp. at 26–34.) In order to "survive summary judgment," Plaintiff must establish four things: Dyer "(1) was a qualified individual with a disability; (2) was discharged; (3) was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (cleaned up). Again, only the fourth element is disputed at summary judgment.

In support of its claim, Plaintiff offers only circumstantial evidence of discriminatory animus, and therefore must proceed under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Gomez v. Haystax Tech., Inc.*,

21

761 F. App'x 220, 235 (4th Cir. 2019) (applying *McDonnell Douglas* to an ADA claim). This framework provides a three-step process to establish, *vel non*, discrimination. First, "the plaintiff bears the burden of establishing a prima facie case of discrimination or retaliation. If the plaintiff succeeds, the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action." *Id.* (cleaned up). Once these two initial burdens are met, "[t]he burden then shifts back to plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory." *Id.* (internal quotation marks omitted).

Where, as here, the employer proffers a non-discriminatory justification for its decision, the summary judgment inquiry focuses largely on the third step. *See E.E.O.C. v. Mfrs. and Traders Trust Co.*, 429 F. Supp. 3d 89, 120–21 (D. Md. 2019) (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008)) (cleaned up) ("[O]nce the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture."). Defendants assert that Dyer's scheduling issues were the reason for her removal from the MWIII contract. Plaintiff argues that three pieces of circumstantial evidence establish that this reason is pretextual: (1) Defendants' intent to remove Dyer while she was out on leave; (2) email correspondence between Defendants' personnel; and (3) the "close temporal nexus" between Dyer's aneurysm diagnosis and her removal. (*See* Cross-Mot. Partial Summ. J. Mem. Supp. at 39–40.)

Viewing the evidence in the light most favorable to the non-moving party, the evidence proffered by Plaintiff, although thin, is certainly more than the proverbial scintilla. As Plaintiff points out, Dyer's scheduling issues and her disability were fundamentally intertwined. (*See* Cross-Mot. Partial Summ. J. at 40; *see also* Dyer Decl. ¶ 29.) This entanglement is reflected in

22

the correspondence between Dyer, Jennifer Johnson, and Barber, which often cited concerns related to medical appointments, as well as unrelated scheduling challenges. (*See, e.g.*, Cross-Mot. Partial Summ. J. Ex. 39 ("I'm also pressed to make it home a certain time to let my son's caregivers go in the eve. I have some1 lined up next week . . . that helps me get to appts.").) A detailed parsing of these mixed messages—and the reason for Barber, Johnson, and Weaver's negative reaction to them—would be inappropriate at the summary judgment stage.

The mixed nature of Dyer's correspondence also detracts from Defendants' attempts to analogize the present facts to *Morris v. Sheetz Inc.*, Civ. No. MFU-13-0095, 2015 WL 1925457 (W.D. Va. Apr. 28, 2015). In that case, defendant was awarded summary judgment, despite correspondence by its employees plausibly suggesting animus. *Id.* at *12. There, however, the summary judgment record clearly established that the relevant correspondence expressed frustration with circumstances wholly unrelated to the plaintiff's disability. *Id.* In addition, that defendant provided significant contemporaneous evidence to support its non-discriminatory rationale, including robustly establishing that the plaintiff was failing to meet her employer's legitimate expectations. *Id.* at *11. Defendants here do not provide any contemporaneous evidence that Dyer's scheduling issues were jeopardizing the efficacy of the OPS 2A MFA desk, and they in fact concede that Dyer was an effective and competent employee. (Mot. Summ. J. Mem. Supp. at 32.)

Further, while Barber denied being aware of Dyer's aneurysm diagnosis when the decision was made to remove Dyer from the MWIII project (*see* Barber Dep. at 173:13–15), she had a conversation that day with one of Dyer's coworkers, Kenneth Brown. (*Id.* at 174:1–19.) Brown also emailed Barber and Jennifer Johnson requesting that they "[p]lease do not reach out the [sic] Mary because she did not want you ladies to know before letting her supervisor know. I assume

she meant at her company.  She was crying and had to go for a walk.  Just wanted to give yall [sic] the heads up."  (Cross-Mot. Partial Summ. J. Ex. 51.)  Brown's email clearly begs the question of *what* Dyer did not want Barber and Jennifer Johnson to know, implying he provided Barber with some information regarding Dyer's situation.  From the correspondence between Brown and Barber, a reasonable factfinder could conclude that Barber was aware that Dyer had received significant, negative news—even if she had not been told specifically that Dyer was diagnosed with an aneurysm.  It is also not wholly implausible that this negative news was the catalyst for Dyer's removal from the MWIII contract in an impromptu meeting less than six hours later.  (*See* Quartus Johnson Dep. at 43:13–21.)

Thus, Plaintiff has produced enough evidence that a reasonable factfinder could conclude the challenges posed by Dyer's disability were the reason why she was removed from the MWIII project.  While reaching this conclusion would require various inferences from inconclusive sources, this is inherent in the nature of the proof countenanced by the *McDonell Douglas* framework.  *See Gary v. Facebook, Inc.*, 822 F. App'x 175, 180 (4th Cir. 2020) (internal quotation marks and citation omitted) ("*McDonnell Douglas* [is] a tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof [of] discrimination.").  While the Court may doubt that such ambiguous proof *should* lead a factfinder to conclude that Dyer's disability was a but for cause of her termination, at this juncture the only appropriate question is whether it *could.  See Fry v. Rand Constr. Corp.*, 964 F.3d 239, 246 (4th Cir. 2020) (emphasis added) (internal quotation marks and citation omitted) ("A plaintiff . . . must put on sufficient evidence to *allow* a jury to find both retaliatory animus and pretext to avoid judgment as a matter of law.").

24

### 3.  *Third-Party Interference*[8]

Last, Defendants move for summary judgment with respect to the EEOC's third-party interference claim under 42 U.S.C. § 12112(b)(2).  This section extends the definition of "discriminat[ion] against a qualified employee on the basis of disability" to those who "participat[e] in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter." *Id.*  It ensures "that an employer may not do through a contractual or other relationship what it is prohibited from doing directly." *Fromm v. MVM, Inc.*, 371 F. App'x 263, 270–71 (3d Cir. 2010) (internal quotation marks and citation omitted).  Plaintiff contends Defendants violated this provision because their contractual agreement with Que meant that Dyer's removal from the MWIII project resulted in her termination by Que.

Defendants argue that this claim fails as a matter of law because nothing in their contract with Que "required" Que to terminate Dyer upon her removal from the MWIII project.  (Mot. Summ. J. Mem. Supp. at 37.)  However, § 12112(b)(2) does not preclude only contractual arrangements that *require* a party to subject an employee to discrimination, but rather all contractual arrangement that have the *effect* of doing so.  As explained above, ascertaining the effect of Dyer's removal from the MWIII contract on her employment at Que requires disentangling how Que's offers of alternative employment intersected with its policy of not "hold[ing] people on overhead." (Quartus Johnson Dep. at 58:6–9.)

---

[8] In its reply brief, Plaintiff argues for the first time that Defendants' alleged third-party interference may be cognizable under 42 U.S.C. § 12203(b) as well as 42 U.S.C. § 12112(b)(2). (*Compare* Am. Compl. ¶ 37 (explaining that Count III is based on the fact that "Defendants have engaged in unlawful employment practices in violation of Section 102 of the ADA, 42 U.S.C. § 12112(b)(2)"), *with* (Pl. Reply. at 21 ("Defendants 'interfered' with Dyer's employment under section 503(b) of the ADA[.]").) Plaintiff offers no reason for this switch in theory, and the Court will follow "[t]he ordinary rule in federal courts [ ] that an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006).

From the record, it is not clear whether Dyer's termination from Que immediately following her removal from the MWIII contract is representative or anomalous. It may well be that most Que employees readily find continued employment when terminated from one contract, seamlessly transitioning to an alternative opportunity.[9] It could, alternatively, be that immediate reemployment is an illusory promise offered by Que to soften the blow of termination and that Que's lean staffing model renders employment there truly contingent on the decisions of prime contractors, like Defendants. The answers to these factual questions cannot be gleaned, much less indisputably resolved, on the current record. Therefore, the Court must deny summary judgment.

## C. Plaintiff's Motion

The Court now turns to Plaintiff's motion for summary judgment with respect to two issues: (1) whether Defendants are a joint enterprise; and (2) whether Dyer is disabled within the meaning of the ADA. Defendants' primary objection is that these two issues are too discrete to be resolved at summary judgment. The Court disagrees.

### 1. Partial Summary Judgment

Defendants ground their procedural objection in the fact that "the EEOC does not ask the Court to resolve any claims brought by a party." (Defs. Reply at 24.) They contend the text and structure of Rule 56 prevent a party from seeking a "declaratory ruling on certain facts or a discreet [sic] element of a claim." (*Id.* at 25.) Rather, they argue, such rulings can be obtained only through Rule 56(g), and only as a "mechanism to salvage some of the constructive results of the judicial efforts made in denying a proper summary judgment motion." (*Id.* at 24–25); *see also* Committee Notes on Rules—2010 Amendment, Fed. R. Civ. P. 56 ("Subdivision (g) applies when the court

---

[9] It is also unclear whether Dyer's placement on a wholly different contract would insulate Defendants from ADA liability. The ADA prohibits discrimination not only with respect to termination, but also the "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). However, this issue is not raised on summary judgment and need not be definitively resolved at this juncture.

does not grant all the relief requested by a motion for summary judgment. It becomes relevant only after a court has applied the summary-judgment standard carried forward in subdivision (a)."). They conclude that because Rule 56(g) is contingent on Rule 56(a), summary judgment motions that seek Rule 56(g) orders are procedurally improper. While this conclusion is correct, Defendants' application of it to this case is not.

Rule 56(g) permits a court to enter an order "stating any material fact . . . that is not genuinely in dispute and treating that fact as established in the case." Fed. R. Civ. P. 56(g). A court can deny a motion seeking to establish only *facts* as an improper Rule 56(g) motion, even if it is styled as a 56(a) motion. *See City of Huntington v. AmerisourceBergen Drug Corp.*, Civ. No. DAF-17-1362, 2021 WL 972295, at *3 (S.D.W. Va. Mar. 15, 2021) ("Plaintiffs' motion is really a motion under Rule 56(g) because it, in essence, seeks a ruling that a certain fact . . . is established"); *Moses H. Cone Mem'l Hosp. Operating Corp. v. Conifer Physician Servs., Inc.*, Civ. No. JLW-13-0651, 2017 WL 1378144, at *5 (M.D.N.C. Apr. 11, 2017) ("[Summary judgment] is improper for what Conifer seeks; that is, a pruning of factual allegations"); *see also Cardenas v. Kanco Hay, L.L.C.*, Civ. No. SAC-14-1067, 2016 WL 3881345, at *6 (D. Kan. July 18, 2016) (denying as procedurally improper a motion for summary judgment seeking judgment on factual questions such as "the lack of benefit from conducting dangerous activities on the premises"). This limitation may also be inferred from the text of Rule 56(a), which requires that a movant establish he or she is entitled to judgment "as a matter of *law*." Fed. R. Civ. P. 56(a) (emphasis added). However, neither Rule 56(a) nor 56(g) provides support for the proposition that a motion seeking to establish a legal element of a claim is improper.

On the contrary, other courts have confirmed that the "part of [a] claim or defense" language that was added with the 2010 Amendments "illustrat[es] that Rule 56 contemplates the

possibility that summary judgment may be entered on less than a full claim and on one or fewer than all of the elements necessary to establish a claim." *Koepplinger v. Seterus, Inc.*, Civ. No. 17-0995, 2020 WL 2063416, at *24 (M.D.N.C. Apr. 29, 2020), *report and recommendation adopted sub nom. Koepplinger v. Seterus, Inc.*, Civ No. 17-0995, 2020 WL 5705915 (M.D.N.C. Aug. 26, 2020).  Plaintiff points out that all of Defendants' in-Circuit caselaw predates these amendments and "since 2010, federal courts have repeatedly found that they are permitted to consider a motion for summary judgment on only a part of a claim." *Id.*  The modern text of Rule 56(a), therefore, confirms that only direct Rule 56(g) motions present an improper division of claims at summary judgment.

Here Plaintiff's motion seeks to establish not only that certain facts are undisputed, but also that legal consequences flow from those facts.  Specifically, Plaintiff seeks judicial determination that factually distinct corporate entities may be treated as an "integrated enterprise" as a matter of *law*, and that the facts establish that Dyer is a qualified individual with a disability under the *legal* definition provided by the ADA.  (*See* Cross-Mot. Partial Summ. J. Mem. Supp. at 26–29.)  Because Plaintiff's motion does not seek "an order stating any material fact . . . that is not genuinely in dispute," without more, Fed. R. Civ. P. 56(g), it is properly before the Court.

### 2.  *CACI as an Integrated Enterprise*

Beyond this procedural objection, Defendants offer little substantive opposition to Plaintiff's motion.  (*See* Defs. Reply at 25–27.)  In fact, as to Plaintiff's integrated enterprise argument, Defendants offer no substantive opposition at all, disclaiming the status of Defendants' corporate interrelation as being of "no significance in this litigation."[10]  (*Id.* at 26.)  Having resolved the procedural dispute, the Court will grant this otherwise unopposed motion.

---

[10] In a footnote, Defendants ostensibly reserved a right to respond "[s]hould the EEOC decide to elucidate its position as to *why* a finding of an integrate enterprise is relevant." (Defs. Reply at 26 n.11 (emphasis in original).)  They have

### 3. *Dyer's Status as a Qualified Individual with a Disability*

As to the second part of Plaintiff's motion, Defendants' only substantive objection is to whether Dyer is disabled under the ADA. A person is disabled, within the meaning of the ADA, if he or she has "a physical or mental impairment that substantially limits one or more major life activities" or a "record of such an impairment," or is "regarded as having such an impairment." 42 U.S.C. §§ 12102(1)(A)–(C).

Defendants do not seriously dispute that Dyer's severe headaches, standing alone, could qualify as an impairment under the ADA. However, they point to deposition testimony that Dyer "alleviated her symptoms by taking Excedrin." (Defs. Reply at 26 (citing Dyer Dep. Vol. III at 125:1–4).) They contend that, under *Murphy v. United Parcel Service, Inc.*, "the determination of a petitioner's disability is made with reference to the mitigating measures he employs." 527 U.S. 516, 521 (1999). Under this standard, Defendants argue that because Dyer could effectively perform her work on the MWIII contract by mitigating her symptoms, summary judgment on this issue would be misplaced.

As Plaintiff points out, what is really misplaced is Defendants' reliance on the standard from *Murphy* following the 2008 ADA Amendments Act (the "ADAAA"). That Act, *inter alia*, statutorily overruled *Murphy* and provided that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as medication." 42 U.S.C. § 12102(4)(E)(i)(I); *see also Jacobs*, 780 F.3d at 572 (citing *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 331 (4th Cir. 2014)) ("In enacting the ADAAA, Congress abrogated earlier inconsistent caselaw."). Emphasizing this sea change to a more expansive view of disability, the ADAAA also commanded courts to construe

---

not exercised this right, nor would such a response have been permissible under the Local Rules. *See* Local Rule 105.2(c) (D. Md. 2018).

"[t]he definition of disability in this chapter . . . in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A).

Applying the mandate expressed in the ADAAA, this Court concludes that Dyer is disabled under the ADA as a matter of law. The record clearly evinces Dyer's challenges with several "major life activities," as that term is statutorily defined. *Id.* § 12102(2)(A)(B) (defining, in a non-exclusive list, "major life activities" to include "concentrating [and] thinking," as well as "major bodily function[s]," including "neurological [and] brain . . . functions"). Further, it appears that she faced these challenges *despite* numerous interventions aimed at mitigating her post-concussion symptoms. (*See* Dyer Decl. ¶ 30 (noting that Dyer has been able to "reduce the frequency and severity of [her] headaches," but not eliminate them entirely).) Thus, Dyer was arguably disabled even under the more stringent standard articulated in *Murphy*. Following enactment of the ADAAA, however, Congress's broad view of disabilities readily encompasses Dyer's post-concussive symptoms. Accordingly, Plaintiff is entitled to summary judgment, as the undisputed facts establish that Dyer was a qualified individual with a disability under the relevant legal standard.

### D. Triable Issues

The Court concludes by briefly summarizing which issues are resolved and which remain to be decided at trial. Three issues are established as a matter of law: (1) Defendants are Dyer's joint employer; (2) Defendants are an integrated enterprise; and (3) Dyer is a qualified individual with a disability.

These holdings place Dyer and Defendants squarely within the framework of the ADA. However, while they establish that Defendants could have violated the ADA with respect to Dyer,

30

there remain numerous significant factual disputes about whether Defendants actually did so.  The Court views these remaining issues as falling predominantly into two categories.  The first category relates to Dyer's time at the MWIII project, whether in that time her disability could have been reasonably accommodated, and if so, who bears the fault for an accommodation not having been reached.

The second category relates more narrowly to Dyer's termination and requires resolving disputes as to who removed Dyer from the MWIII project, why they did so, and what impact that had on her employment with Que.  The factual disputes elucidated by summary judgment are not exclusive of other disputes that the parties may identify, but did not raise in the instant motions.

### IV.    Conclusion

For the foregoing reasons, an order shall enter: (1) denying Defendants' Motion for Summary Judgment (ECF No. 75) and (2) and granting Plaintiff's Cross-Motion for Partial Summary Judgment (ECF No. 78).

DATED this ___6___ day of May, 2021.

BY THE COURT:

James K. Bredar

James K. Bredar
Chief Judge